UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| E&I GLOBAL ENERGY SERVICES, INC. and E&C GLOBAL, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> LIBERTY MUTUAL INSURANCE CO., <br><br> Defendant. | 4:20-CV-04033-KES <br><br><br> FACTUAL FINDINGS AND ORDER FINDING DEFENDANT NOT LIABLE ON ALL COUNTS |

I.    **Procedural Background and Factual Findings**

Beginning on February 14, 2023, the court held a four-day bench trial.

Before the court were E&I Global Energy Services, Inc.'s and E&C Global, LLC's

(collectively "Plaintiffs") claims against Liberty Mutual Insurance Co. for 1)

Breach of Contract; 2) Contractual Breach of the Implied Covenant of Good

Faith and Fair Dealing; 3) Fraud and Deceit; and 4) Negligent

Misrepresentation. *See* Docket 43 (amended complaint listing such claims plus

an unjust enrichment claim); Docket 60 at 31-34 (granting summary judgment

on plaintiffs' unjust enrichment claim).

After hearing all the testimony and reviewing all the exhibits, the court

finds the following facts were proven by the greater weight of the evidence:

This case revolves around the VT Hanlon Project (Project) that the

Western Area Power Administration (WAPA) sought to complete. *See generally*

Docket 108 at 134-152. Jeffrey Bruce formed E&I and E&C. *See* Docket 111 at

131-32. Although Bruce did not explicitly testify that he owned E&C, the court

1

credits his testimony that he and another one of his employees had "partnered up and built" E&C. *See id.* at 132. Similarly, Bruce repeatedly referred to his and his partner's actions with respect to E&C as "we," further indicating that Bruce was one of the owners of E&C. *See id.* at 131-32. Thus, the court finds that Bruce was an owner of E&C. Although E&I and E&C are similarly named and did similar work, Bruce testified that the two entities "didn't gel well together" due to having "different philosophies." *See id.* at 132. Bruce also repeatedly distinguished the two entities throughout his testimony. *See, e.g., id.* at 131-33; Docket 112 at 82-83. Thus, the court finds that E&I and E&C are separate legal entities.

E&I's involvement on the project started as a subcontractor to Isolux, the principal contractor with WAPA. *See* Docket 111 at 134, 137-38; Docket 110 at 12. Representatives of Isolux, Waylon Ferreira and Mike Tiffin, approached Bruce and told Bruce that Isolux needed help. *See* Docket 111 at 137-39; *see also* Docket 108 at 118 (showing Waylon Fereira was a construction manager with Isolux). Bruce went down to the VT Hanlon construction site "right away" with "trucks, tools, and manpower" to "help [] get Isolux out of the ditch." *See* Docket 111 at 138-39; Docket 112 at 33. Bruce arrived on site sometime in the summer of 2016 without having signed a subcontract with Isolux. *See* Docket 111 at 138-39, 142, 150. Despite not signing a contract, Bruce supplied a trailer with tools and rental equipment such as forklift machines and manlifts. *See id.* at 145-48.

Bruce testified that when he arrived on site, the project was "in tough shape" and "a total mess," observing "right off the bat" problems with grading, no fence around the project, and incomplete buildings. *See id.* at 150-52, 155. Based on this testimony, the court finds Bruce knew that the project was risky from the beginning. Bruce arrived on site without any plans, disks, drawings, or specifications. *See id.* at 140-41. Bruce also testified that he did not have access to all of the project drawings for the site, and instead only received the relevant drawings that pertained to specific tasks E&I performed. *See id.* at 141. Bruce asked Isolux for all of the drawings, but Isolux indicated it could not print all of them. *Id.* at 141-42.

Eventually, after WAPA inquired about E&I's identity given that E&I was not an official subcontractor for Isolux, E&I signed two subcontracts with Isolux. *See id.* at 142, 144-45; *see* Docket 108 at 17-63; 68-114. One subcontract required E&I to complete various steel and aluminum work, electrical installation, and other related items. *See* Docket 108 at 20. This subcontract gave E&I access to a Dropbox link that contained "VT Hanlon Drawings and Specifications[.]" *Id.* at 55. The second subcontract required E&I to construct a service building for the substation. *See id.* at 71.

Liberty and The Insurance Company of the State of Pennsylvania (collectively the "sureties") issued a payment bond and performance bond on behalf of Isolux and in favor of WAPA for the prime contract between Isolux and WAPA. *See id.* at 1-4. Liberty served as the lead surety. *See* Docket 110 at 152. The performance bond guaranteed to the federal government that Isolux would

3

complete the contract according to its terms, and if Isolux failed to perform, the sureties would step in and perform according to the terms of the bond. *See id.* at 153. The payment bond protected the subcontractors and suppliers who provided work for Isolux and for whom Isolux failed to pay. *See id.* at 153-54. Carolyn Banks served as Liberty's claim specialist and handled the claims related to the project. *See id.* at 12.

On November 17, 2016, Jonathan Dittmer, a WAPA representative, issued a Stop Work Order to Isolux, effective November 18, 2016. *See* Docket 108 at 5. On December 2, 2016, Dittmer notified Liberty that WAPA had terminated the main contract between itself and Isolux, and requested Liberty to submit a proposal detailing how Liberty intended to complete the project. *See id.* at 6. Liberty responded on December 7, 2016, requesting additional time for its consulting team to visit the site and obtain documentation surrounding the project. *See id.* at 11-12.

At the time WAPA terminated Isolux, Liberty had little information about the project. *See* Docket 110 at 156-57; 163 (Banks stated that prior to sending out requests for documents to WAPA and Isolux that Liberty did not have any of the requested documentation); 164 (Banks testified that at the time, she "did not even know that E&I was a subcontractor on [the] job[.]"). David Mattingly, vice president of Professional Construction Consulting (PC2), testified that Liberty hired PC2 to support Liberty in its investigation. *See* Docket 111 at 28. Mattingly testified he was "heavily involved early on in PC2's involvement" with

4

the VT Hanlon project. *See id.* at 29. Marvin House, PC2's owner, also testified that Liberty was one of PC2's clients. *See* Docket 112 at 151.

As part of the investigation, Mattingly visited the site in December 2016. *See* Docket 111 at 35. Bruce gave Mattingly a couple-hour tour of the site, where Bruce "point[ed] out some of the issues that he was running into during the construction." *Id.* at 69. Mattingly also took pictures of the site. *See id.* at 35-36. Mattingly testified that prior to the tour, he "didn't know anything about the job." *Id.* at 69. During this December 2016 visit, Mattingly also spoke with WAPA representatives, including Dittmer, in the WAPA office. *See id.* at 36. Dittmer gave Mattingly four CDs, which Mattingly never gave to Bruce. *Id.* at 36, 45-46. Mattingly also summarized his trip in Exhibit 518. *See* Docket 108 at 119. There is no evidence in the record suggesting Mattingly gave Bruce this summary.

After this December 2016 visit, Mattingly and House (both with PC2 and on behalf of Liberty), and Bruce negotiated a Completion Agreement. *See id.* at 121-22; Docket 111 at 29. E&C—rather than E&I—submitted its first written bid to be the completion contractor of the Project on January 6, 2017. *See* Docket 108 at 121-22. The purpose of a Completion Agreement was for the sureties to negotiate a contract with a completion contractor and then "turn [the completion contractor] over to the government and allow [the completion contractor and government] to work together directly without the involvement of the sureties." *See* Docket 110 at 158. E&C submitted other proposals in the next month and a half. *See, e.g.*, Docket 108 at 128-133; *see also* Docket 112

at 83 (Bruce admitting that "every single one of E&C's proposals came from E&C.").

On March 29, 2017, E&C, E&I, Liberty, and the Insurance Company of the State of Pennsylvania signed a Completion Agreement. *See* Docket 108 at 134. Under the Completion Agreement, E&C is listed as the "Completion Contractor" and E&I is listed as a "Subcontractor." *Id.* This Completion Agreement requires E&C, as the Completion Contractor, to "prosecute the Work until Completion of the Project." *See id.* at 136. In return, Liberty promised to "pay Completion Contractor for Completion of the Project[.]" *Id.* In exchange for E&C's performance of completing the project, Liberty agreed to pay E&C the "Completion Price." *See id.* at 137, 140. The Completion Agreement defines the Completion Price as $5,428,625.69 and as being "all-inclusive." *See id.* at 135. Specifically, the Completion Agreement provides that other than exclusions, the Completion Price consists of,

> all subcontractor and vendor costs, the costs of repair, replacement and/or correction of any Defects, the costs of addressing any warranty claims, the costs of general conditions work and services by Completion Contractor, including its site labor force, the costs for Completion Contractor's project staff, and all other direct and indirect costs of performance under this Agreement, including any and all insurance and/or bond premiums.

*Id.* The Completion Agreement specifies that the Completion Price does not include exclusions. *Id.* The Completion Agreement defines "exclusions" as:

 (a) Payments due Principal's vendors for materials ordered by, but not paid by, Principal prior to the date of this Agreement;

 (b) Payments due Principal's subcontractors or vendors for work performed for Principal prior to the date of this Agreement; and

 (c) Additional Grading Contingency, if any, due Completion Contractor pursuant to Section 3 of this Agreement. The Additional Grading Contingency is expressly limited to the not [sic] price of $100,000.

*Id.* at 136. The Completion Agreement further confirms this Exclusion Clause by stating that the "Completion Contractor shall not be responsible for paying sums due any of Principal's subcontractors or vendors with respect to materials ordered and/or work performed on behalf of Principal prior to the date of this Agreement." *Id.* at 144. The Completion Agreement also provides that E&C "visually investigated the status of and the conditions affecting" the project, and "fully informed itself with respect to those items required to complete the [project][.]" *Id.* at 143. E&C further agreed to these steps "independent of any representations or warranties, either express or implied, of [Liberty] . . . or any of [Liberty's] respective employees, agents, consultants, or representatives." *Id.*

 The sureties also signed a Tender Agreement with WAPA and E&C as the Completion Contractor, in which the sureties "have agreed to tender, and [WAPA] has agreed to accept, with the consent of [E&C], [E&C] as completing contractor to complete the Project in accordance with the terms of the Completion Agreement and the Bonded Contract." *See id.* at 153; *see also*

7

Docket 111 at 94-95 (Mattingly testifying that a tender agreement "hands the completing contractor over to the obligee to finish the project. So in other words, the surety has found a completion contractor to step in Isolux's shoes to complete the project."). The Payment Bond survived the Tender Agreement, because although the Tender Agreement "fulfill[ed] the obligations that Liberty ha[d] under the performance bond . . . [it] in no way invalidate[d] what [Liberty's] obligations [were] under the payment bond." *See* Docket 110 at 177-78.

While Bruce negotiated the Completion Agreement, Isolux employee Ed Crittelli gave Bruce access to the bill of materials, described the division of labor, and identified who was responsible for ordering equipment. *See* Docket 111 at 184-85. Critelli emailed Bruce with information "about what [Isolux] had ordered and should be shipped and what should be on-site[,]" which Bruce himself admitted "gave [him] a pretty good idea" in helping him form his first bid to PC2. *See id.* at 185. Bruce relied on these documents to inform his initial bid. *See id.* at 191. Bruce also relied on Exhibit 49, a document containing information about equipment for the project, which came from either Isolux or WAPA. *See* Docket 112 at 8-10.

Bruce never testified that he relied on Exhibit 522, a spreadsheet with information about certain equipment on the project, in forming his bid. *See* Docket 108 at 123-27. The court credits Mattingly's testimony that Mattingly created the first four columns (labeled "No.," "Project Line Items," "Original Value," and "Balance to Finish") and sent it to Bruce. *See* Docket 111 at 82-83.

Bruce then added the fifth and seventh columns of this spreadsheet (labeled "Actual Remaining Work," and "E&I Comments"), and sent it back to Mattingly. *See id.*; Docket 108 at 123. Once Mattingly received Bruce's additions, Mattingly added the sixth and eighth columns labeled "Pc2 Adjustments" and "Pc2 Comments." *See id.*; Docket 108 at 123. Mattingly could not remember whether he sent the final spreadsheet back to Bruce. *See* Docket 111 at 124. Similarly, Bruce never asked Mattingly about the status of equipment on-site or status of delivery of equipment. *Id.* at 75-76, 78. Bruce specifically knew there were more documents while negotiating the Completion Agreement, but still decided to complete the Agreement after WAPA directed him to do so. *See id.* at 214; Docket 112 at 99.

On February 10, 2017, during negotiations, Mattingly sent Bruce an email stating "Jeff, [t]hese are the drawings that Jonathan [Dittmer] provided to me. Jonathan indicated they include all of the revisions to date." *See* Docket 108-1 at 1; Docket 112 at 62. The court finds that Mattingly's representations were misleading. As mentioned above, Mattingly admitted that Dittmer gave Mattingly four CDs, and that Mattingly never gave these CDs to Bruce. *See* Docket 111 at 35-36, 45-46. Mattingly testified that the first CD contained various change orders and drawings, as well as three amendments. *See id.* at 72-73. These amendments included Amendment 2 specifications, drawings, and solicitations. *Id.* at 73. Thus, the court finds that Mattingly did not provide Bruce with all of the drawings Mattingly had on file.

9

But Mattingly testified that the first CD's contents were all accessible online and were all issued by WAPA prior to solicitation of bids for the prime contract. *See id.* at 74. The court credits this testimony because Exhibit 6, which includes Amendment 2 documents that were on the first CD, shows that these Amendment 2 documents were available online. *See id.* at 100; Docket 109 at 186. Thus, the court finds Mattingly did not intend to deceive Bruce by not giving Bruce the first CD.

With respect to the second, third, and fourth CDs, the court finds that Mattingly similarly did not intend to deceive Bruce when Mattingly failed to give Bruce these CDs during negotiations. The second CD had pictures of the site that were taken by WAPA. *See* Docket 111 at 73. Mattingly testified that these pictures were aerial photos that did not provide any details regarding materials onsite. *See id.* at 75. The third and fourth CDs contained submittals for various parts of the project. *See id.* at 73, 75. Mattingly explained that submittals are documents that a contractor submits to an engineer or architect to confirm the contractor fully and accurately understands the various aspects of a project. *See id.* at 73-74. Mattingly testified that he believed Bruce had access to the contents of the third and fourth disks, stating "to get as far along as [plaintiffs] did, [he] do[esn't] know how [plaintiffs] could not have had the submittals." *See id.* at 72. Ultimately, Mattingly testified that he "felt [the Plaintiffs] had a good understanding of the project[]" and that "it was [his] understanding [Bruce] had other documents." *See id.* at 46, 78. The court credits Mattingly's testimony

regarding his beliefs about Bruce's knowledge of the project and Mattingly's testimony about the contents of the four CDs.

Plaintiffs argue Mattingly intentionally withheld 533 pages of schematics and point to Exhibit 536, notes from of a recording of a meeting between Bruce, Dittmer, and various other individuals from sometime in early 2018. *See* Docket 117 at 18-19; Docket 108-1 at 194-97; Docket 112 at 98. Plaintiffs argue that this document shows that "WAPA's contracting staff stated they handed off over 400 pages of documentation intended for E&I to Liberty Mutual." *See* Docket 117 at 19. Exhibit 536 contains a note that says,

> Jonathan tells Jeff, E&I was given up to Revision 4 in the original documents sent from WAPA. Everything after that was put into Mod. 1 And Mod 2. 400+ pages of documents all together. The changes E&I are asking for was given to the bonding company to give to E&I. (according to Jonathan.)

Docket 108-1 at 195. But the court finds the only materials that Mattingly had access to and withheld from Bruce were the four CDs. *See* Docket 111 at 79, 87; Docket 113 at 36. The 533 pages of documents, contained in Exhibit 55, are dated February 2, 2017. *See* Docket 109-1 at 217-749. Because Mattingly received the four CDs in December 2016, the 533 documents could not have been on the CDs. Plaintiffs have failed to provide much context about Exhibit 536 and as a result the court views it skeptically. That exhibit appears to be a summary of the conversation rather than a verbatim transcription of the conversation and lacks details such as what the 400+ pages of documents contained and when WAPA allegedly gave Bruce these documents. *See* Docket 108-1 at 194-97. The court finds Exhibit 536 less reliable and thus credits

11

Mattingly's testimony over Exhibit 536 and finds that Mattingly did not have access to these 533 documents and thus did not intentionally withhold them from Bruce.

During the negotiations between PC2 and plaintiffs, House told Bruce that PC2 or Liberty "guaranteed" that one of Isolux's original subcontractors, Dakota, would perform for E&I at a specific price due to the ratification process. *See* Docket 112 at 161-65. Mattingly testified that one of the purposes of a ratification agreement is for an original subcontractor to "continue to work for the completing contractor to finish [the original subcontractor's] scope of work." *See* Docket 111 at 89. In short, the ratification agreement requires subcontractors to agree that they "would honor their warranty" so that the completing contractor could enforce the original subcontracts as if the completing contractor was the original principal. *See id; see also* Docket 110 at 188 (Banks testifying that under the ratification agreement, E&C "would have the rights and obligations" that Isolux had); 108-1 at 214-20. House testified that his use of "guarantee" was a "poor choice of words" because in the event Dakota would fail to perform, Liberty was not going to negotiate on E&C's behalf. *See* Docket 112 at 164-65. House further testified that by saying that PC2 "guaranteed" Dakota as a subcontractor, House intended to communicate simply that PC2 would assign the Dakota subcontract to Bruce and that "[Bruce] can depend on that number" because ratification "locks in" the price. *See id.* at 161-63. The court finds this explanation to be credible, given that one of the purposes of a ratification agreement is for an original subcontractor

12

to promise to finish the job as originally contracted to for a specific amount. *See* Docket 112 at 163-64. Thus, the court finds that House did not intend to deceive Bruce when he promised PC2 or Liberty "guaranteed" Dakota would perform at a specific price.

The court further finds that although the Completion Agreement lists E&C as the completion contractor, E&I ended up serving as the completion contractor due to E&C having difficulties obtaining a bond as required under the Completion Agreement. *See* Docket 112 at 83; *see also* Docket 108 at 142-43. Bruce testified that it was "E&I that did the work." *See* Docket 112 at 83; *see also* Docket 111 at 132. Bruce further testified that he "wanted to change" E&C to E&I in the contract, but that Dittmer—rather than anyone from Liberty—said, "not to worry about it" and that Dittmer would "get a new document printed up." *See* Docket 112 at 83-84.

Plaintiffs submitted no evidence of E&C assigning its rights and obligations to E&I. Similarly, plaintiffs submitted no evidence of E&C's financial status or loss as a result of this project. Instead, the only evidence plaintiffs submitted with respect to potential damages pertains to E&I. *See, e.g.*, Docket 109-1 at 94, 96-97, 115, 119, 123, 128, 130, 136, 138, 140, 143, 145, 165-66, 180, 183; Docket 112 at 16-21; *see also* Docket 108-2 at 210-385 (showing E&I's statements of income, payroll documents, and other tax documents). Plaintiffs' expert, Aaron Raddock, also conducted his analysis soley based on E&I's financial loss rather than E&C's. *See* Docket 113 at 11.

As far as Raddock was aware, "E&C didn't have any financial part of the case[.]" *Id.*[1]

## II.   Discussion

### A. Breach of Contract

Liberty first argues that plaintiffs' breach of contract claim fails as a matter of law because plaintiffs "have failed to demonstrate how E&I should be legally entitled to pursue claims by E&C under the Completion Agreement." Docket 114 at 17 n.4. Liberty further argues that E&I "appears to be the party in interest asserting the contract claim based on the damage evidence presented at trial." *Id.*

Liberty correctly notes that under the Completion Contract, E&C—and not E&I—is named as the Completion Contractor for the project. *See* Docket 108 at 134. In the Completion Contract, E&I is named as a Subcontractor. *Id.* Thus, according to Liberty, although "E&I ultimately served as the completion contractor and made a demand on Liberty for 'missing equipment[,]' " Liberty "did not authorize E&I to serve as the completion contractor for the Project," and thus "E&I does not have a claim against the Sureties in relation to the Completion Price or under the sections of the Completion Agreement that survived tender of E&C to WAPA." Docket 114 at 17 n.4.

---

[1] At trial, the court reserved ruling on the admissibility of Jonathan Dittmer's deposition designations. *See* Docket 113 at 47-48. Specifically, the court ordered the parties to identify any portion of Dittmer's testimony in the deposition on which the parties relied in their post-trial briefs. *See id.* at 47. Because none of the parties rely on Dittmer's testimony, the court need not decide on the admissibility of any portions of Dittmer's deposition.

Plaintiffs argue that Liberty "raises this argument for the first time in a post-trial brief[,]" rather than pleading this defense as an answer, affirmative defense, or part of its summary judgment motion. *See* Docket 117 at 3. Thus, plaintiffs argue that Liberty has waived this argument. *See id.* But under the Federal Rules of Civil Procedure, only certain defenses are subject to waiver. *See* Fed. R. Civ. P. 12(h)(1). Specifically, a party waives a defense if it fails to raise the following defenses at an appropriate time: lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process. *See* Fed. R. Civ. P. 12(b)(2)-(5), (h)(1). In contrast, a failure to state a claim upon which relief can be granted may be raised at trial. *See* Fed. R. Civ. P. 12(h)(2)(C).

Here, Liberty's argument regarding whether E&I can assert a claim under the Completion Contract despite E&C being named the Completion Contractor does not fall under the defenses of lack personal jurisdiction, improper venue, insufficient process, or insufficient service. Rather, it is effectively a motion to dismiss for failure to state a claim. Thus, because a party may raise this type of defense at trial and because Liberty raised its argument in its post-trial brief,[2] the court rejects plaintiffs' argument that Liberty has waived it. *See* Fed. R. Civ. P. 12(h)(2)(C).

---

[2] Although styled as a post-trial brief, the brief functioned as a closing argument at trial because the court ordered the parties to submit post-trial briefs instead of delivering closing arguments given the voluminous record. *See* Docket 112 at 181-82.

Turning to the merits of Liberty's argument, E&C is the entity that entered into the Completion Agreement with Liberty as the completion contractor. *See* Docket 108 at 134. And E&C's, rather than E&I's, status as a completion contractor matters: under the Completion Agreement, Liberty agreed to pay the *completion contractor* (E&C) the completion price. *Id.* at 140. The completion price, and whether certain equipment or work is included under the completion price, is the subject of the breach of contract claim. *See* Docket 115 at 6-7 (plaintiffs' brief arguing that Liberty "refus[ed] to pay for materials that Isolux had ordered, but not paid for, before WAPA terminated Isolux[]" and "refused to pay subcontractors for work those subcontractors performed before WAPA terminated Isolux."); Docket 114 at 17-18 (Liberty arguing plaintiffs' claims are included within completion price); Docket 108 at 135 (defining completion price). E&I has submitted no evidence of E&C assigning its claim to E&I. Thus, E&I has failed to explain why its status as a subcontractor, as opposed to the completion contractor, permits it to recover items that Liberty allegedly owes the completion contractor, E&C.

In an attempt to explain away this defect, E&I argues that E&I is a named party in the Completion Agreement and that Bruce owns both E&I and E&C. *See* Docket 117 at 3. The court agrees with these factual assertions. The Completion Agreement does indeed include E&I as a named party, but only as a subcontractor, not the completion contractor. *See* Docket 108 at 134. And as explained above, the court finds Bruce was one owner of E&C. But neither of these facts explain why E&I, a subcontractor, would be able to assert a claim

16

on behalf of E&C, the completion contractor, given that the Completion Agreement specifically provides that Liberty promised to pay the completion price to the completion contractor, rather than a subcontractor. *See* Exhibit Docket 108 at 140. Because of this defect, the court agrees with Liberty that E&I may not recover E&C's breach of contract damages.

But E&C is also a named plaintiff. *See* Docket 43. And E&C is the completion contractor. *See* Docket 108 at 134. Thus, even though E&I cannot sue for breach of contract, the court finds E&C is still able to pursue its claim. The court finds that E&C's breach of contract claim was properly presented during trial and thus turns to its merits.

To succeed on a breach of contract claim under South Dakota law, the plaintiff must prove that there is (1) an enforceable promise; (2) a breach of that promise, and (3) resulting damages. *Bowes Constr., Inc. v. S.D. Dep't. of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010). The plaintiff must prove each element by a preponderance of the evidence. *See Regan v. Moyle Petroleum Co.*, 344 N.W.2d 695, 696 (S.D. 1984); *see also McKie v. Huntley*, 620 N.W.2d 599, 604 (S.D. 2000). "Preponderance of the evidence is defined as the greater weight of evidence." *See Pieper v. Pieper*, 841 N.W.2d 781, 787 (S.D. 2013) (quoting *L.S. v. C.T.*, 760 N.W.2d 145, 151 (S.D. 2009) (cleaned up)).

Here, E&C has failed to meet its burden to prove that E&C suffered damages. Under South Dakota law, the measure of damages for breach of contract is ordinarily "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby[.]" SDCL § 21-2-1. "No

17

damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin." *Id.* "[T]he ultimate purpose behind allowance of damages for breach of contract is to place the injured party in the position he or she would have occupied if the contract had been performed, or to 'make the injured party whole.' " *Stern Oil Co., Inc. v. Brown*, 908 N.W.2d 144, 151 (S.D. 2018) (quoting *Ducheneaux v. Miller*, 488 N.W.2d 902, 915) (S.D. 1992)). Damages must be reasonably certain, which requires "proof of a rational basis for measuring loss, without allowing [the fact finder] to speculate." *McKie*, 620 N.W.2d at 603.

The evidence submitted at trial shows that E&I—rather than E&C—is the entity that paid for the equipment or work that Liberty allegedly[3] owed E&C under the Completion Agreement's Exclusions Clause. *See, e.g.*, Docket 109-1 at 94, 96-97, 115, 119, 123, 128, 130, 136, 138, 140, 143, 145, 165-66, 180, 183; *see also* Docket 108 at 136 (defining exclusions). Additionally, plaintiffs only introduced evidence of E&I's—not E&C's—financial status and profitability. *See* Docket 112 at 16-21; *see also* Docket 108-2 at 210-385 (showing E&I's statements of income, payroll documents, and other tax documents). Plaintiffs' expert Aaron Raddock stated that his analysis solely focused on E&I's financial loss rather than E&C's. *See* Docket 113 at 11. Indeed, Raddock testified that as far as he was aware, "E&C didn't have any financial part of the case[.]" *Id.* Bruce confirmed Raddock's understanding

---

[3] Because the court finds E&C failed to prove damages, the court need not determine whether Liberty breached the Completion Agreement.

when Bruce testified that E&I, rather than E&C, "did the work" and took over as the completion contractor during the project. *See* Docket 112 at 83; Docket 111 at 132.

E&I's potential damages are insufficient to show that E&C suffered damages. Although Bruce was one of the owners of both entities, they were separate legal entities. E&C submitted no evidence that E&C assigned its contract to E&I, nor did E&C submit any evidence that E&I served as E&C's agent. Although Bruce testified that E&C and E&I did "similar work," he also testified that the two companies were separate and that they "didn't gel well together" due to having "different philosophies." *See* Docket 111 at 132. Thus, the mere fact that Bruce was one of the owners of both entities does not entitle E&C to recover alleged damages to which E&I suffered.[4]

E&C has failed to demonstrate it suffered any monetary damages as a result of this project. Because E&C has failed to meet its burden to prove that E&C suffered damages, it has failed to prove its breach of contract claim.[5] *See Bowes Constr., Inc.*, 793 N.W.2d at 43.

_____

[4] Bruce testified that as soon as he read the Completion Agreement that named E&C as the completion contractor, he asked to change the completion contractor to E&I. *See* Docket 112 at 83-84. This action alone shows Bruce knew E&C and E&I were separate entities. And as explained above, Dittmer—and not anyone from Liberty or PC2—told Bruce "not to worry about it" and that Dittmer would "get a new document printed up." *See* Docket 112 at 84. Thus, to the extent E&I argues Liberty deceived Bruce into believing the Completion Agreement really listed E&I as the completion contractor, that representation came from WAPA rather than Liberty or PC2.

[5] For this reason, the court also rejects E&C's contractual breach of the implied covenant of good faith and fair dealing argument. Under South Dakota law, "[e]very contract contains an implied covenant of good faith and fair dealing

## B. Fraud and Deceit

The court now turns to plaintiffs' fraud and deceit claim against Liberty.

Plaintiffs' core arguments with respect to this claim rely on PC2's and its

employees'—Marv House and David Mattingly—actions and representations to

Bruce. *See* Docket 115 at 10-18. The court must first determine whether PC2

and its employees acted as Liberty's agents and thus whether statements and

actions by PC2 and its employees are attributable to Liberty. *See A.P. & Sons*

*Constr. v. Johnson*, 657 N.W.2d 292, 297 (S.D. 2003) (determining whether

agency relationship exists is a "fact specific issue") (quoting *Action Mech., Inc. v.*

*Deadwood Hist. Pres. Comm'n*, 652 N.W.2d 742, 753 (S.D. 2002); *Ehresmann v.*

*Muth*, 757 N.W.2d 402, 406 (S.D. 2008) ("A principal is held liable for the

misrepresentations of his agent . . . .").

Under South Dakota law, an "[a]ctual agency exists when a principal and

agent expressly agree to enter into an agency relationship." *A.P. & Sons*, 657

N.W.2d at 297.  The factual elements necessary to establish an actual agency

---

which prohibits either contracting party from preventing or injuring the other
party's right to receive the agreed benefits of the contract." *Garrett v. BankWest,*
*Inc.*, 459 N.W.2d 833, 841 (S.D. 1990). The implied covenant of good faith and
fair dealing doctrine is not a separate, independent tort. *See Farm Credit Servs.*
*of Am. v. Dougan*, 704 N.W.2d 24, 27 (S.D. 2005). Instead, this doctrine allows
a party to succeed in a breach of contract claim "even though the conduct
failed to violate any of the express terms of the contract agreed to by the
parties." *Garrett*, 459 N.W. 2d at 841. For this reason, it provides a theory of
liability for breach of contract when the express language does not address the
conduct at issue, but the conduct is nonetheless unreasonable. *See Mahan v.*
*Avera St. Luke's*, 621 N.W.2d 150, 160 (S.D. 2001). Thus, even if Liberty
breached the implied covenant of good faith and fair dealing—a conclusion the
court need not determine—E&C's argument fails because E&C has failed to
prove that E&C suffered damages and so has failed to establish liability for
breach of contract. *See Bowes Constr., Inc.*, 793 N.W.2d at 43.

relationship include: "(1) manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking." *Id.* (citing *Kasselder v. Kapperman*, 316 N.W.2d 628, 630 (S.D. 1982)).

Here, the court finds PC2, Mattingly, and House acted as Liberty's agents at all relevant times. Mattingly testified that Liberty hired PC2 in order to support Liberty with respect to the VT Hanlon project. *See* Docket 111 at 28. Mattingly also testified that PC2, on behalf of Liberty, negotiated the completion contract with Bruce. *See id.* at 29. Mattingly was "heavily involved early on in PC2's involvement" with the VT Hanlon project. *See id.* House owns PC2. *See* Docket 112 at 149. House confirmed that Liberty was one of PC2's clients. *See id.* at 151. These facts show that there was a "manifestation by [Liberty] that [PC2] shall act for [Liberty], [PC2]'s acceptance of the undertaking, and the understanding of the parties that [Liberty] is to be in control of the undertaking." *See A.P. & Sons*, 657 N.W.2d at 297 (citation and numbering omitted). Although Liberty argues that E&I has "failed to establish that Mr. Mattingly or Pc2 operated as the agent of Liberty," Liberty concedes in other filings that PC2's employees acted as Liberty's "consultants." Docket 116 at 14; Docket 114 at 6. Whether labeled an agent or consultant, the fact remains that PC2 acted on behalf of Liberty while negotiating the Completion Agreement. The court finds PC2's, Mattingly's, and House's actions and representations are attributable to Liberty.

The court now turns to the elements of fraud and deceit under South Dakota law. The South Dakota Supreme Court stated that to prevail under a tort claim of fraud, a plaintiff must prove:

> That a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage.

*Stabler v. First State Bank of Roscoe*, 865 N.W.2d 466, 477 (S.D. 2015) (citation omitted). Similarly, under South Dakota law, "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL § 20-10-1. Deceit means one of the following:

> (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
> (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
> (3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
> (4) A promise made without any intention of performing.

SDCL § 20-10-2. These statutory provisions are "declaratory of the common law[.]" *Mash v. Cutler*, 488 N.W.2d 642, 653 (S.D. 1992).

Plaintiffs make three main arguments for why Liberty, through its agent PC2, engaged in fraud and deception. First, plaintiffs argue that Liberty misled Bruce about what equipment, supplies, and labor Bruce should include in its bids. *See* Docket 115 at 12, 15, 17. But Bruce's testimony refutes this assertion. Bruce testified that the information he received regarding the bill of

materials, equipment, and who was responsible for ordering what equipment came from Ed Critelli, an employee of Isolux. *See* Docket 111 at 184-85. Specifically, Bruce testified that Critelli had emailed Bruce with information ""about what [Isolux] had ordered and should be shipped and what should be on-site." *See id.* at 185. This information, according to Bruce, "gave [him] a pretty good idea" in helping him form his first verbal bid to PC2. *See id.* Bruce even testified that he looked at these documents to help inform his initial verbal bid. *See id.* at 191. Because this information did not come from Liberty or PC2, it cannot form the basis of a fraud and deceit claim against Liberty.

Plaintiffs point to the fact that Liberty withheld the contents of two CDs (the third and fourth CDs) that contain submittals. *See* Docket 117 at 9. It is true that Dittmer, from WAPA, gave Mattingly, a PC2 representative, four CDs in December 2016. *See* Docket 111 at 36-37. Mattingly admitted that he did not send Bruce these four CDs at any point. Docket 111 at 45-46. But even if Liberty had a duty to disclose these CDs,[6] Mattingly testified that these CDs

---

[6] Plaintiffs argue that Bruce had a "confidential relationship" with House, Mattingly, and Banks. *See* Docket 115 at 10, 14. Plaintiffs further argue that Bruce's confidential relationship means that these individuals had a duty to disclose facts relating to the Completion Agreement. *See* Docket 115 at 14 (citing *Schwartz v. Morgan*, 776 N.W.2d 827, 831 (S.D. 2009)). The court is skeptical of plaintiffs' claim that these individuals had a duty to disclose because the South Dakota Supreme Court instructs that this duty to disclose facts applies only if such facts were not "discoverable by reasonable care" and if the circumstances were such that "the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling[.]" *See Schwartz*, 766 N.W.2d at 831 (citations and quotations omitted). Here, for the reasons described throughout this opinion, the court finds Bruce had access to most, if not all, of the information during negotiations, and that Bruce had, at the very least, the same amount of knowledge that Liberty had during negotiations such

had submittals for various parts of the project and that he believed Bruce already had access to the contents of the third and fourth disks. *See id.* at 73, 75. Importantly, Mattingly testified that "to get as far along as [plaintiffs] did, [he] do[esn't] know how [plaintiffs] could not have had the submittals." *See id.* at 72.

As discussed above, other evidence in the record confirms Mattingly's testimony. Bruce testified that Isolux officer, Ed Critelli, had given him "a lot of information" about "what [Isolux] had ordered and should be shipped and what should be on-site." *See id.* at 184-85. Bruce also testified that he relied on Exhibit 49, a document that either Isolux or WAPA had provided him, with information about equipment for the project. *See* Docket 112 at 8-10.

Furthermore, E&I's original status as a subcontractor to Isolux supports a finding that E&I had access to these submittals. As discussed above, E&I's Electrical Subcontract with Isolux required E&I to "furnish" and "install[]" various equipment required for the subcontract. *See* Docket 108 at 20. Furthermore, in this subcontract, E&I had access to a Dropbox link that contained "VT Hanlon Drawings and Specifications[.]" *Id.* at 55. All of this evidence shows Mattingly was correct in believing Bruce had access to information surrounding the project, further supporting Mattingly's innocent

---

that there was no "shocking" difference in bargaining power between E&I and Liberty to trigger this duty to disclose. *See id.* But because the court finds that neither House, Mattingly, or Banks intended to deceive Bruce, the court need not decide whether Liberty had a duty to disclose facts during its negotiations with Bruce. In other words, the court assumes without deciding Liberty did in fact have a duty to disclose to Bruce any relevant information it had when it negotiated with Bruce regarding the terms of the Completion Agreement.

intentions. Mattingly also testified that Bruce never asked about the project submittals, nor did Bruce ever ask about the status of equipment on-site or status of delivery of equipment. *See* Docket 111 at 75-76, 78.

As discussed above, the court credits Mattingly's testimony and finds Mattingly believed Bruce already had access to the information in these CDs. Mattingly was not attempting to hide information from Bruce. Thus, the court finds Mattingly did not intend to deceive Bruce by not handing Bruce the third and fourth CDs.

Plaintiffs also cite Exhibits 522, 518, and 530 in support of their fraud claim. *See* Docket 117 at 10-11. Exhibit 522 is a spreadsheet that includes information on equipment for the project. *See* Docket 108 at 123-27. But Bruce never testified to relying on this spreadsheet, much less having a copy of its final version. Additionally, Mattingly testified that he created the first four columns and then sent it over to Bruce. *See* Docket 111 at 82-83. Bruce then added the fifth and seventh column. *See id.* Once Bruce sent his input, Mattingly then added the sixth and eighth column. *See id.* Crucially, Mattingly did not recall whether he had sent this final version (with Mattingly's added information in the sixth and eighth columns) to Bruce. *See* Docket 111 at 124. Thus, plaintiffs have failed to meet their burden to show Bruce even had the final version of this spreadsheet, much less relied on it during negotiations. Exhibit 522 does not alter the court's analysis. With regard to Exhibit 518, a document that Mattingly prepared after his December 2016 site visit, there is

25

no evidence in the record that Bruce relied on this document. *See* Docket 108 at 119. Exhibit 518 does not support plaintiffs' fraud and deceit claims either.

Exhibit 530 similarly falls short. Exhibit 530 is an email from Mattingly to Bruce on February 10, 2017, where Mattingly says "Jeff, [t]hese are the drawings that Jonathan provided to me. Jonathan indicated they include all of the revisions to date." Docket 108-1 at 1. By its explicit text, this email is limited to drawings rather than information about equipment. *Id.* Thus, although relevant to whether PC2 withheld drawings from E&I, this email does not provide evidence that PC2 misled E&I about the status of the equipment at the VT Project's site.

In short, the court rejects plaintiffs' first argument that Liberty withheld information about equipment. Plaintiffs have identified no representations from Liberty, PC2, or any of PC2's employees to E&I about the status of the project's equipment. Furthermore, as discussed above, the court finds Bruce had access to the information regarding this equipment. Thus, the court finds plaintiffs failed to prove Liberty made a false statement with respect to Liberty's representations about the equipment, as required to prove fraud and deceit. *See Stabler*, 865 N.W.2d at 477; SDCL § 20-10-2. But even if Mattingly "suppress[ed] . . . a fact . . . [that he was] bound to disclose," or "g[ave] information of other facts which [were] likely to mislead for want of communication of that fact," the court finds he did not "inten[d] to induce [the plaintiffs] to alter [the plaintiffs'] position to [plaintiffs'] injury or risk."  SDCL

§§ 20-10-1, 20-10-2. To the extent plaintiffs rely on Mattingly's failure to give the third and fourth CDs to Bruce, the court credits Mattingly's testimony that he believed Bruce had access to the materials contained in the third and fourth disks, and thus finds that Mattingly did not intend to deceive Bruce when Mattingly did not send those documents in his February 10, 2017 email.

The court now addresses plaintiffs' second argument, that Liberty, PC2, or any of PC2's employees withheld project drawings from Bruce and thus intentionally defrauded and deceived plaintiffs. First, with regard to Exhibit 530, the court finds that Mattingly sent this email on February 10, 2017 along with 185 documents to Bruce. *See* Exhibit 108-1 at 1; Docket 112 at 61-62. In the email, Mattingly said, "Jeff, [t]hese are the drawings that Jonathan provided to me. Jonathan indicated they include all of the revisions to date." Docket 108-1 at 1. As discussed above, Mattingly admitted to having four CDs (with the first two containing drawings and photos of the VT Hanlon site) as of December 2016. *See* Docket 111 at 36-37. And Mattingly admitted that he did not send Bruce these four CDs at any point. *Id.* at 45-46. Thus, the court finds that Mattingly, at the very least, made a misleading statement to Bruce when he told Bruce that the 185 drawings Mattingly sent to Bruce were "the drawings that Jonathan provided to [Mattingly]" because Mattingly had more drawings. *See* Docket 108-1 at 1. The court finds plaintiffs have proved that it is more likely than not that Mattingly recklessly made a false statement. *Stabler*, 865 N.W.2d at 477. Similarly, the court finds Mattingly "g[ave]

27

information of other facts which [were] likely to mislead for want of communication of that fact," under the meaning of SDCL § 20-10-2.

But this finding alone is not dispositive because to prove fraud and deceit, Mattingly must have *intended* to deceive the plaintiffs or intended to induce the plaintiffs to alter their position to injury or risk. *Stabler*, 865 N.W.2d at 477; SDCL § 20-10-1. Here, Mattingly testified that he did not send over these CDS because he believed Bruce already had access to the contents of the CDS. Docket 111 at 74-75. Starting with the first CD, Mattingly testified that the first CD contained various change orders and drawings, as well as three amendments. *See* Docket 111 at 72-73. These amendments included Amendment 2 specifications, drawings, and solicitations. *Id.* at 73. Mattingly testified that the first CD's contents were all accessible online and were all issued by WAPA prior to solicitation of bids for the prime contract. *See id.* at 74. The court credits this testimony because Exhibit 6, which includes Amendment 2 documents that were on the first CD, shows that these Amendment 2 documents were available online. *See id.* at 100; Docket 109 at 186. The evidence shows Mattingly did not intentionally withhold information from Bruce. Thus, the court finds Mattingly did not intend to deceive Bruce or induce E&I to alter its position to injury or risk when he did not send the first CD.

The court finds the same for the second CD. The second CD had pictures of the site taken by WAPA. *See* Docket 111 at 73. Mattingly testified that these pictures were aerial photos that did not provide any details regarding materials

onsite. *See id.* at 75. The court agrees that these photos had limited, if any, value for Bruce for purposes of negotiating the Completion Contract. Bruce had been on-site since sometime in the Summer of 2016. *See id.* at 138-39. In December 2016, Bruce even gave Mattingly a tour of the site lasting a couple of hours, where the two took pictures of the site. *See id.* at 35-36. During this tour, Bruce "point[ed] out some of the issues that he was running into during the construction." *Id.* at 69. Mattingly, on the other hand, testified that he "didn't know anything about the job." *Id.* Because Bruce already had been on site for multiple months and had first-hand knowledge of the site's condition, the court finds that Mattingly did not intend to deceive Bruce by not sending him the second CD that included aerial photos of the project's site.

Ultimately, Mattingly testified that he "felt [plaintiffs] had a good understanding of the project[]" and that "it was [his] understanding [Bruce] had other documents." *See id.* at 46, 78. Based on the above discussion of the CDs, the court credits his testimony and finds he did not intend to deceive or harm plaintiffs at any point during his interactions with Bruce.

Plaintiffs argue that Mattingly also withheld from Bruce 533 pages of schematics. *See* Docket 117 at 18-19. But as discussed above, the record refutes Bruce's testimony that the additional 533 pages of documents in Exhibit 55 were in the four CDs. Mattingly testified that he had received the four CDs in December 2016. *See* Docket 111 at 35-36. But the dates of every document in Exhibit 55 are dated February 2, 2017. *See* Docket 109-1 at 217-749. Thus, these 533 pages could not have been in the four CDs. Furthermore,

29

Mattingly testified that he does not remember Dittmer sending Mattingly anything after the drawings that Dittmer sent him in December 2016. Docket 111 at 79, 87; Docket 113 at 36. The court credits Mattingly's testimony and finds that his testimony is credible based on the above discussion of the CDs as well as his overall demeanor as a witness. The court finds that Mattingly did not withhold the 533 documents that Bruce alleges Mattingly withheld because Mattingly did not have access to these documents. Thus, with respect to these 533 documents, E&I failed to meet its burden in showing it was more likely than not that Mattingly made a false statement or suppressed a fact that he was bound to disclose.

Plaintiffs resist this conclusion arguing that Mattingly is not credible. *See* Docket 117 at 18. Specifically, plaintiffs argue that Mattingly "lied to Mr. Bruce about what WAPA gave him in the same email in which he provided the 185 pages of plans." *See id.* As discussed above, Mattingly sent Bruce an email on February 10, 2017 stating that Mattingly was sending "all of the revisions to date" with respect to the project's drawings. *See* Docket 108-1 at 1. Mattingly sent this email even though he did not include the four CDs. *See* Docket 111 at 74-75. As explained above, the court finds that Mattingly did not intend to deceive Bruce because Mattingly believed Bruce had access to all of the information on the CDs. Thus, the court disagrees with plaintiffs' characterization that Mattingly lied to Bruce.

Plaintiffs also point to Exhibit 536, notes from a recording of a meeting between Bruce, Dittmer, and various other individuals from sometime in early

30

2018. *See* Docket 117 at 19; Docket 108-1 at 194-97; Docket 112 at 98.

Plaintiffs argue that this document shows that "WAPA's contracting staff stated

they handed off over 400 pages of documentation intended for E&I to Liberty

Mutual." *See* Docket 117 at 19. In Exhibit 536, the document has a note that

says,

> Jonathan tells Jeff, E&I was given up to Revision 4 in the original
> documents sent from WAPA. Everything after that was put into Mod
> 1. And Mod 2. 400+ pages of documents all together. The changes
> E&I are asking for was given to the bonding company to give to E&I.
> (according to Jonathan.)

Docket 108-1 at 195. As discussed above, the court credits Mattingly's

testimony over this exhibit. E&I has failed to provide much context about this

exhibit. The notes do not explain when WAPA allegedly gave Bruce over four

hundred pages of documents, nor does it state what precisely the contents of

these documents were. *See id.* Additionally, Exhibit 536 appears to be a

summary of the conversation rather than a verbatim transcription of the

conversation, and thus the court finds it to be less reliable. Thus, Exhibit 536

does not alter the court's finding that Mattingly did not have the 533

documents and did not withhold them from Bruce.

Plaintiffs' third argument regarding fraud and deceit relies on House's

testimony. *See* Docket 115 at 18. Plaintiffs argue that House's promise that

PC2 or Liberty "guaranteed" Dakota would perform at a specific price due to

this ratification process was a "hollow promise." *See id.* As mentioned above,

House testified that he told Bruce that PC2 or Liberty "guaranteed" that one of

Isolux's original subcontractors, Dakota, would perform for E&I at a specific price due to the ratification process. *See* Docket 112 at 161-65.

Although House admitted that saying "guarantee" was a "poor choice of words," the court finds House did not intend to deceive Bruce because House intended to communicate simply that PC2 would assign the Dakota subcontract to Bruce and that "[Bruce] can depend on that number" because ratification "locks in" the price. *See id.* at 161-63. House was discussing what it meant for a subcontractor to be ratified. *See id.* at 161-65. Because one of the purposes of a ratification agreement is for an original subcontractor to promise to finish the job as originally contracted to for a specific amount, the court finds House's explanation credible, given the context of the conversation. *See id.* at 163-64. The court rejects plaintiffs' third argument.

In conclusion, the court rejects plaintiffs' three arguments on their fraud and deceit claims. The court finds that plaintiffs failed to meet their burden to prove that Liberty, PC2, or any of PC2's employees committed fraud or deceit.

### C. Negligent Misrepresentation

To prove negligent misrepresentation under South Dakota law, a plaintiff must show that the defendant: "ma[de] (1) a misrepresentation, (2) without reasonable grounds for believing the statement to be true, (3) with the intent to induce a particular action by [the plaintiff], and the [plaintiff] (4) change[d] position with actual and justifiable reliance on the statement, and (5) suffers damage as a result." *Fisher v. Kahler*, 641 N.W.2d 122, 126-27 (S.D. 2002).

The South Dakota Supreme Court has explained that the "intent to induce" prong refers to the plaintiff having to prove that the defendant intended to induce the plaintiff's *reliance. See Am. Fam. Ins. Grp. v. Robnik*, 787 N.W.2d 768, 771 (S.D. 2010). Here, as explained above, the court finds that Mattingly did not intend to deceive or induce Bruce to alter his position to his injury or risk. The court makes this determination, in part, because the court credits Mattingly's testimony that he believed Bruce already had access to the documents and information contained in the four CDs that Mattingly admitted to not giving to Bruce. *See* Docket 111 at 74-75. The court similarly finds that House did not intend to deceive or induce Bruce to rely on House's representation with respect to House's "guarantee" that Dakota would perform at a specific price. *See* Docket 112 at 161-65. As explained above, House did not intend to deceive Bruce, but rather only intended to communicate that the ratification agreement between Liberty and Dakota meant that Dakota promised to perform for E&I as the Completion Contractor just as Dakota had previously promised Isolux. *See id.* at 161-63. Thus, the court finds that neither Mattingly nor House acted with the intent to induce Bruce to rely on their representations.

But even if Mattingly or House intended to induce Bruce, the court finds that Bruce did not reasonably rely on Mattingly's or House's representations as required for negligent misrepresentation. *See Fisher*, 641 N.W.2d at 126-27. With respect to Bruce's reliance on Mattingly's representations, as discussed above, Bruce had been on-site since sometime in the Summer of 2016. *See*

33

Docket 111 at 138-39. Upon arriving, Bruce admitted that he knew Isolux was "in trouble" and Isolux asked him if they could "get down there right away." *Id.* at 138. When Bruce arrived on scene, Bruce believed the project to be "in tough shape" and "a total mess." *Id.* at 150. Thus, Bruce had knowledge from the start that this project was risky.

Bruce's knowledge of the site grew over time. Bruce received at least some project documents while serving as a subcontractor for Isolux. *See id.* at 141. Bruce also asked Isolux for all of the drawings, but learned from Isolux that Isolux could not print them all. *See id.* at 141-42. In December 2016, Bruce gave Mattingly a tour of the site lasting a couple of hours, where the two took pictures of the site. *See id.* at 35-36. Bruce also "point[ed] out some of the issues that he was running into during the construction." *Id.* at 69. In contrast, Mattingly, testified that he "didn't know anything about the job." *Id.* Bruce even admitted that from day one, he knew there were more documents. Docket 111 at 214. Bruce specifically knew there were more documents while negotiating the Completion Agreement, but still decided complete the Agreement after WAPA directed him to do so. *See* Docket 112 at 99.

Furthermore, although not dispositive, the language of the Completion Agreement specifically provides that E&C "visually investigated the status of and the conditions affecting" the project, and "fully informed itself with respect to those items required to complete the [project][.]" Docket 108 at 143. E&C further agreed to these steps "independent of any representations or warranties, either express or implied, of [Liberty] . . . or any of [Liberty's]

respective employees, agents, consultants, or representatives." *Id.* In summary, the court finds Bruce did not reasonably rely on any representations Mattingly made to him because Bruce had more knowledge about the project than Mattingly. Indeed, some of Mattingly's knowledge of the site came from Bruce himself. *See* Docket 111 at 35-36, 69.

With respect to House's representations about "guarantee[ing]" Dakota would perform at a specific price, although Bruce testified he had never been through this ratification process before, Bruce never testified that he relied on this representation at any point during the trial. *See* Docket 111 at 175. Furthermore, as discussed above, Bruce signed the Completion Contract that states E&C fully informed itself with respect to the status and conditions of the project independent of any representations of Liberty's agents. *See* Docket 108 at 143. Thus, the court finds the plaintiffs have failed to prove that Bruce justifiably relied on House's representations.

Rather than Bruce relying on Mattingly or House's representations, the court finds that Bruce's testimony about his company's financial status during plaintiffs' negotiations with Liberty help explain why Bruce continued with his negotiations. Bruce admitted that in between the time WAPA had terminated the original contract and the time Bruce eventually signed the Completion Agreement, his company was "bleeding pretty bad" because he continued to pay his employees throughout this time not wanting to lose them. Docket 111 at 177-79, 206. Bruce further admitted that his company was "financially strapped" and that he had outstanding debt to individuals from his work as a

subcontractor as well as for rentals. *See id.* at 206-07. The court finds Bruce's financial struggles partially motivated him to sign the Completion Agreement despite him knowing that he did not have all the documents. *See* Docket 112 at 99. This alternative explanation cuts heavily against a finding that Bruce reasonably relied on Liberty's representations.

In short, the court finds that Bruce did not reasonably rely on Mattingly's or House's representations. Thus, the court finds plaintiffs failed to meet their burden in proving that Liberty is liable for negligent misrepresentation.

## III. Conclusion

Plaintiffs have failed to meet their burden to prove any of their claims. E&I has failed to show why it is legally entitled to pursue a breach of contract for breach of the Completion Agreement when E&C, not E&I, is listed as the completion contractor. E&C has failed to show it suffered any damages from any alleged breach of contract because E&I, rather than E&C, is the entity that purchased the equipment and work that Liberty allegedly owed under the Completion Agreement's exclusion clause. Plaintiffs have similarly failed to meet their burden to prove Liberty or PC2 engaged in fraud or negligent misrepresentation. Thus, the court finds Liberty not liable on all counts with respect to both E&I and E&C and will enter judgment in favor of Liberty.

Dated June 13, 2023.

BY THE COURT:

/s/ *Karen E. Schreier*
_____

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

36