UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| E&I GLOBAL ENERGY SERVICES, INC. and E&C GLOBAL, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>LIBERTY MUTUAL INSURANCE CO.,<br><br>Defendant. | 4:20-CV-04033-KES<br><br><br>ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER |

After conducting a four-day bench trial, the court issued factual findings and conclusions of law and found defendant, Liberty Mutual Insurance Co., not liable to plaintiffs, E&I Global Energy Services, Inc. and E&C Global, LLC, on all counts. Docket 118. On June 13, 2023, the court issued a judgment in favor of Liberty. Docket 119. On June 28, 2023, E&C and E&I (collectively "plaintiffs") filed a motion to reconsider. Docket 120. Plaintiffs raise three primary arguments.[1] First, plaintiffs argue that the court improperly weighed the evidence on plaintiffs' fraud and negligent misrepresentation claims. *See* Docket 121 at 2-4. Second, plaintiffs argue that the court erred in finding E&I lacks the ability to recover damages that E&C allegedly suffered. *See id.* at 4-

_____

[1] In plaintiffs' brief in support of their reconsideration motion, plaintiffs explicitly state that they challenge only "two fundamental legal errors." Docket 121 at 2. But before discussing these two arguments in-depth, plaintiffs also appear to raise a third argument regarding the courts' weighing of the evidence for plaintiffs' fraud and negligent misrepresentation claims. *See id.* at 2-4. Thus, the court construes plaintiffs' argument as raising three primary arguments rather than two.

10. Third, plaintiffs argue the court erred in denying them a jury trial. *See id.* at 10-17. The court addresses these arguments in turn.[2]

## I.     Standards of Review

Under Federal Rule of Civil Procedure 52(b), the court, on a party's motion, may amend its findings or make additional findings, and may amend the judgment accordingly. Fed. R. Civ. P. 52(b). "Th[is] motion may accompany a motion for a new trial under Rule 59." *Id.* A Rule 52(b) motion is "intended to permit a party to move the trial court to clarify or supplement factfindings to enable the appellate court to understand the factual issues determined at trial." *Chute v. Viken*, 2018 WL 4082569, at *2 (D.S.D. Aug. 27, 2018). Under Federal Rule of Civil Procedure 59(a)(2), "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Rule 59(e) provides that a party may move the court to alter or amend a judgment. Fed. R. Civ. P. 59(e).

Both Rules 52(b) and 59 serve the limited function of providing a means to request that a court correct manifest errors of law or fact or to present newly discovered evidence. *See Nat'l Metal Finishing Co., Inc. v. BarclaysAmerican/Com., Inc.*, 899 F.2d 119, 123 (1st Cir. 1990) (Rule 52(b); *United States v. Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006) (Rule 59(e)). Generally, "[m]otions to amend a judgment cannot be used to raise

---

[2] The court addresses Liberty's motion for attorney's fees in a separate order. *See* Docket 122.

arguments which could have been raised prior to the issuance of the judgment." *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1397 (8th Cir. 1996). These rules are not "intended to routinely give litigants a second bite at the apple, but to afford an opportunity for relief in extraordinary circumstances." *Dale and Selby Superette & Deli v. U.S. Dept. of Agric.*, 838 F.Supp. 1346, 1348 (D. Minn. 1993).

Under Civil Rule of Procedure 60(b), "[o]n motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding" for a variety of reasons. *See* Fed. R. Civ. P. 60(b). Those reasons include:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

*Id.* A Rule 60(b) motion "must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). Determining what a "reasonable time" is under Rule 60(b) depends on the facts of the case. *See Nucor Corp. v. Neb. Pub. Power Dist.*, 999 F.2d 372, 374 (8th Cir. 1993). The

court considers "whether the party opposing the motion has been prejudiced by the delay in seeking relief and whether the moving party had some good reason for the failure to take appropriate action sooner." 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2866 (3d ed. 2022). Even if a court entertains a Rule 60(b) motion on its merits, it is "an extraordinary remedy" and "relief under this rule is to be granted only when exceptional circumstances prevented a party from seeking redress through the usual channels." *Id.*

## II. Discussion

### A. Fraud and Negligent Misrepresentation

Plaintiffs argue that the court failed to explicitly consider several pieces of evidence that plaintiffs believe require the court to alter its factual findings on their fraud and negligent misrepresentation claims. *See* Docket 121 at 2-4. The court evaluates these claims under Federal Rules of Civil Procedure 52 and 59. The court provided a lengthy discussion of these claims. *See* Docket 118 at 20-36. While the court did not explicitly mention some of the evidence that plaintiffs raise in their motion to reconsider, none of these facts change the court's analysis.

Plaintiffs first point to testimony from Mattingly, in which Mattingly was impeached with email statements. *See* Docket 121 at 3 (citing Docket 111 at 61-62). But these email statements were not admitted as substantive evidence but rather only admitted for impeachment purposes. *See* Docket 111 at 61-62. Thus, at best, this evidence goes towards Mattingly's credibility, but does not

4

alter the court's conclusions that Mattingly did not intend to deceive Bruce because the court credited Mattingly's testimony that Mattingly believed Bruce had access to the drawings. *See* Docket 118 at 28-29. In addition to the reasons set forth in the original factual findings, the court makes explicit what was implicit in its original finding: the court credits Mattingly's testimony based on his credible demeanor while on the stand.

Next, plaintiffs point to Mattingly's testimony that it would be reasonable for Bruce to rely on Mattingly's statements regarding the VT Hanlon site. *See* Docket 121 at 3 (citing Docket 111 at 114). Plaintiffs also point to statements House made that Bruce did not know what a tender agreement was, that Bruce "just didn't get it," and that House wrote E&C's bid for Bruce. *See id.* (citing Docket 112 at 171, 176 and Docket 109-1 at 30-40). The court recognizes these arguments but finds that Bruce nonetheless did not reasonably rely on Mattingly's or House's representations. As the court discussed in its previous factual findings, Bruce knew that Isolux was "in trouble" and knew the construction site was "in tough shape" and a "total mess." *See* Docket 111 at 138, 150. Bruce had access to drawings from Isolux, and gave Mattingly a tour of the cite, where Bruce "point[ed] out some of the issues that he was running into during the construction." *Id.* at 35-36, 69. Mattingly, in contrast, knew nothing about the job prior to learning about it from Bruce. *Id.* at 69. And Bruce knew there were more documents while negotiating the Completion Agreement, yet still decided to go forward with the agreement after WAPA directed him to do so. *See* Docket 112 at 99.

The court reiterates its findings. The court finds it unreasonable for Bruce to have relied on Mattingly's representations regarding the project when Bruce is the one who introduced Mattingly to the project in the first place. Bruce knew all along the rough shape this project was in, and thus it was not reasonable for him to rely for specific information on Mattingly, an individual who had no prior knowledge of this site prior to Bruce giving him a tour. And even though Bruce knew there were more documents, Bruce decided to still go forward with the agreement after *WAPA*—not Mattingly—directed him to do so. *See* Docket 112 at 99. The fact that Bruce acted in part based on what *WAPA* told him undermines plaintiffs' contention that Bruce relied on Mattingly's representations, much less reasonably relied. The court has weighed the evidence the plaintiffs point to in their reconsideration motion and find it insufficient—in the wake of the other evidence the court has already explicitly discussed—to show that plaintiffs met their burden of proof in proving their negligent misrepresentation claim.

Plaintiffs also cite to Liberty's performance bond and Liberty's motive to induce Bruce to sign the Completion Agreement. *See* Docket 121 at 3. In support, plaintiffs point to the fact that Bruce's initial bid was $9 million and eventually the final Completion Price was roughly $5.75 million. *See id.* But the court finds that the mere fact that Liberty may have had financial incentive to find a completion contractor does not prove that it is liable. If that were the case, every surety who issues a tender agreement and completion contract would be subject to civil liability. The court recognizes that Liberty had a

financial incentive to find a completion contractor, but finds that Bruce has failed to meet his burden to prove Liberty acted improperly. Similarly with the evidence regarding Bruce eventually lowering his bid, the court finds that is a natural progression with negotiations in general. It is normal for a bid to go down as the parties negotiate—and Bruce's testimony that he was "financially strapped" helps explain why Bruce was willing to lower his bid. *See* Docket 111 at 206-07.

Plaintiffs argue that the court failed to consider that Bruce lowered his bid by at least $2 million dollars. *See* Docket 121 at 4 (citing Exhibits 520 and 527). But the court finds that plaintiffs failed to prove why this decrease demonstrates any wrongdoing by Liberty or PC2. To the contrary, it is consistent with finding that Bruce was financially strapped and wanted to complete a deal so that he could get at least something out of the deal. Plaintiffs also point to Liberty's alleged delay in paying Isolux's subcontractors (including E&I), *see id.*, but plaintiffs failed to make this argument in either of their post-trial briefs, even though it was available to them at the time. *See generally* Dockets 115, 117. Thus, the court declines to address it.

Finally, plaintiffs argue the court failed to acknowledge that Bruce walked away from the Completion Agreement on February 16, 2017, and yet decided to return to negotiations after speaking with Melissa Lee, counsel for Liberty. *See* Docket 121 at 4. But Bruce never testified about what Lee said during this conversation, only stating that she "talked [him] off the ledge" and that he felt "good." *See* Docket 111 at 224. Further, consistent with this court's

previous discussion about Bruce's desire to get back to work as quick as possible due to financial concerns, Bruce testified that following this contract, he "was hoping to get back on-site right away." *Id.* at 225. The court finds this evidence is insufficient to alter the court's findings and insufficient to meet plaintiffs' burden of proving their fraud and negligent misrepresentation claims. The court rejects this argument.

In short, the court has now explicitly addressed each of plaintiffs' arguments raised in the motion for reconsideration regarding their fraud and negligent misrepresentation claims, even though it had no obligation to do so. *See Allied Van Lines, Inc. v. Small Bus. Admin.*, 667 F.2d 751, 753 (8th Cir. 1982) ("It is well established that the trial court does not need to make specific findings on all facts but only must formulate findings on the ultimate facts necessary to reach a decision."). The court has weighed all of the evidence and declines to alter its findings. The court rejects plaintiffs' first main argument.

**B.      E&I's ability to recover under the Completion Contract**

E&I next challenges the court's finding that E&I cannot recover for E&C's breach of contract claim. Docket 121 at 4-10. The court construes E&I's motion under Rules 52 and 59. The court already rejected some of E&I's arguments. *See* Docket 118 at 14-19; Docket 117 at 3-4. With respect to E&I's new arguments, E&I could have raised them in post-trial briefings but did not. Thus, with respect to this issue, the court denies E&I's motion to reconsider on that basis alone. *See Diocese of Winona*, 89 F.3d at 1397; *Dale*, 838 F.Supp. at

1347-48. But for purposes of completeness, the court alternatively denies E&I's motion to reconsider with respect to this issue on its merits.

E&I starts by citing a South Dakota procedural statute regarding what South Dakota courts should do if a case is not prosecuted in the name of the real party in interest. *See* Docket 121 at 5 (citing SDCL § 15-6-17(a)). Because this court is sitting under diversity jurisdiction, federal—not state—procedural law applies. *See Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009); *see also Airlines Reporting Corp. v. S & N Travel, Inc.*, 58 F.3d 857, 861 (2d Cir. 1995) (recognizing Rule 17(a) as a procedural rule). The Federal Rules of Civil Procedure have an analogue to SDCL § 15-6-17(a), and thus the court construes E&I's arguments to address the relevant Federal Rule of Civil Procedure, namely Rule 17(a).

Under Federal Rule of Civil Procedure 17(a)(1), "[a]n action must be prosecuted in the name of the real party in interest." Rule 17(a)(3) further provides that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be submitted into the action."  "The 'real party in interest' is the [entity] who, under governing substantive law, is entitled to enforce the right asserted, and in a diversity case, the governing substantive law is ordinarily state law." *Sorenson v. Sorenson*, 64 F.4th 969, 977 n.6 (8th Cir. 2023) (quoting *Iowa Pub. Serv. Co. v. Med. Bow Coal Co.*, 556 F.2d 400, 404 (8th Cir. 1977)).

9

Here, the court first turns to the real party in interest in this case, as determined by South Dakota law. Under South Dakota law, a plaintiff must prove that between itself and the defendant, 1) the plaintiff entered into an enforceable promise; 2) the defendant breached the promise towards the plaintiff; and 3) the plaintiff suffered damages. *See Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005); *see also* SDCL § 53-1-2 (providing that the essential elements of the existence of a contract are: *parties* capable of contracting, *their* consent, a lawful object, and sufficient cause or consideration). Plaintiffs' breach of contract claims stem from Liberty's alleged failure to pay for items excluded from the Completion Price, to which the Completion Contractor was entitled. *See* Docket 108 at 134-35; Docket 115 at 6-7 (plaintiffs' brief arguing that Liberty "refus[ed] to pay for materials that Isolux had ordered, but not paid for, before WAPA terminated Isolux[]" and "refused to pay subcontractors for work those subcontractors performed before WAPA terminated Isolux."); Docket 114 at 17-18 (Liberty arguing plaintiffs' claims are included within completion price).

The court will first examine the issue of the real party in interest for each claim. E&C, as the Completion Contractor under the Completion Agreement, could have succeeded in a breach of contract claim so long as it established the required elements of breach of contract. *See* Docket 108 at 134. E&I, on the other hand, was not the Completion Contractor under the Completion Agreement, but instead a subcontractor. *Id.* Thus, for E&I to succeed, E&I would have needed to show that E&C assigned E&C's contractual rights and

obligations to E&I. Without an assignment, E&I cannot recover because E&I did not enter into an enforceable promise with Liberty with respect to the completion price and the money Liberty owed to the Completion Contractor for excluded items from the Completion Price. *See id.; Guthmiller*, 699 N.W.2d at 498.

Either way, since the inception of this case, E&I and E&C have been named as plaintiffs, including in plaintiffs' original complaint and plaintiffs' amended complaint. *See* Docket 1; Docket 43. At trial, both E&I and E&C had an opportunity to present evidence in support of their breach of contract claims. But E&C failed to submit evidence of suffering any damages and thus failed to prove an essential element of a breach of contract claim. *See* Docket 118 at 18-19; *see Guthmiller*, 699 N.W.2d at 498. And E&I failed to demonstrate that E&C had assigned its rights and obligations to E&I, making E&I unable to prove that E&I entered into a binding agreement regarding the Completion Price and items excluded from the Completion Price. *See* Docket 118 at 16-17; *Guthmiller*, 699 N.W.2d at 498.

The court did not improperly dismiss the action for failure to prosecute in the name of the real party in interest but instead found at the conclusion of trial that neither E&I or E&C met their burden to prove a breach of contract claim. *See* Docket 118 at 14-19. Thus, Federal Rule of Civil Procedure 17 is inapplicable and does not alter the court's findings. And because Rule 17 is inapplicable here, the court rejects E&I's argument that Liberty waived this

11

argument. *See* Docket 121 at 6.[3] Similarly, E&I's argument that the court "committed a fundamental legal error by dismissing E&I's claim without giving E&I and E&C an opportunity to ratify" also fails. *See id.* at 10. Ratification was not necessary here because both E&I and E&C had their opportunity to pursue their claims at trial. *Cf. Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 83 (2d Cir. 2013) ("To ratify a suit, the real party in interest must (1) authorize continuation of the action and (2) agree to be bound by its result.") (quotation omitted)). The court rejects E&I's first "real party in interest" argument.

Second, E&I shifts focus and argues that E&C did in fact validly assign its rights to E&I. *See* Docket 121 at 9-10. In support, E&I relies on *Fritzel v. Roy Johnson Constr.*, 594 N.W.2d 336, 338 (S.D. 1999). *See id.* at 9. In *Fritzel*, the South Dakota Supreme Court considered whether a plaintiff could proceed in a chose of action despite the lack of a formal transfer from the original party who could proceed and the new plaintiff. *See* 594 N.W.2d at 337-38. *Fritzel* held that an "an assignment of an action need not be in writing and any arrangement however informal will suffice to effect a valid transfer if that was the owner's intent." *Id.* at 337. Even assuming a chose in action is analogous to

---

[3] As discussed in the court's original findings, Liberty was not required to raise this issue when arguing that E&I failed to meet its burden to prove its contract claim. *See* Docket 118 at 15. Furthermore, contrary to E&I's argument that it was not on notice that Liberty may argue that E&I cannot recover for any of E&C's contractual rights, Liberty pleaded several affirmative defenses (Defenses 17-19) that squarely raised this issue. *See* Docket 44 at 13. Thus, even if Liberty was required to give advance notice of this defense, the court finds that Liberty did so.

a breach of contract suit, this case is inapposite because *Fritzel* did not involve a case with a contractual provision preventing assignment without appropriate written notice. *See id.*

Here, E&C explicitly agreed that "Completion Contractor has no right to assign any of its rights or obligations hereunder without the prior written consent of [the Western Area Power Administration [WAPA]] and [Liberty Mutual and The Insurance Company of the State of Pennsylvania]." *See* Docket 108 at 149. The South Dakota Supreme Court recognizes that anti-assignment provisions are valid and enforceable. *See Grady v. Commers Interiors, Inc.*, 268 N.W.2d 823, 825 (S.D. 1978). Thus, for E&I to prove that E&C validly assigned E&C's rights and obligations to E&I, E&I must prove that it obtained WAPA's, Liberty's, and ISOP's written consent. *See* Docket 108 at 149.

At trial, E&I failed to submit any evidence of WAPA's, Liberty's, or ISOP's written consent to allow E&C to assign E&C's obligations and rights (as a Completion Contractor) to E&I. E&I disputes this conclusion and points to a patchwork of documents purporting to show WAPA's, Liberty's, and ISOP's written consent. *See* Docket 132 at 4 (citing Docket 109-1 at 769 and Docket 108-2 at 143). But this argument fails for at least two reasons. First, none of these documents ever explicitly state that E&C has assigned its rights and obligations to E&I. *See* Docket 109-1 at 769; Docket 108-2 at 143. Rather, E&I relies on an implication that because E&I is now the entity that may be the Completion Contractor, that somehow amounts to written consent. The court rejects this premise.

Second, and more fundamentally, none of these documents are signed by ISOP. *See id.* Under the Completion Contract, ISOP is a surety and thus ISOP's written consent is necessary. *See* Docket 108 at 134, 149. E&I attempts to explain this deficiency away by arguing that "Liberty was the lead surety and was responsible for things like investigating and deciding claims." *See* Docket 132 at 4 (citing Carolyn Banks's testimony that Liberty served as the lead surety at Docket 110 at 60 and 152). E&I then cites Banks's alleged written consent in a September 11, 2017[4] letter she wrote to an E&I employee stating that Liberty tendered E&I, as Completion Contractor, to WAPA. *See* Docket 132 at 4 (citing Docket 109-1 at 1). Thus, according to E&I, Banks "regularly corresponded for ISOP[,]" and so her alleged written consent constitutes both Liberty's and ISOP's consent. *Id.*

The court rejects this argument because E&I assumes Liberty's mere status as the primary surety negates the requirement for ISOP to give its written consent to an assignment. But the Completion Contract specifically rejects this assumption, because it requires the prior written consent of "[WAPA] and *Sureties*." Docket 108 at 149 (emphasis added). The Completion Contract specifies that both Liberty and ISOP are "sureties" and thus the

---

[4] The date of this letter, September 11, 2017, is also noteworthy because under the Completion Contract, Liberty, ISOP, and WAPA had to give its "*prior* written consent" to E&C allowing assignment. Docket 108 at 16. The parties entered into the Completion Contract in late March 2017, and E&I submitted its request for missing materials in July 2017. *Id.* at 1; Docket 109-1 at 53. Thus, even if the court were to find the September 11, 2017 letter to constitute Liberty's written consent—and the court does not so find—the dates alone show that Liberty's September 11, 2017 letter did not give *prior* written consent.

contract's plain language requires that both Liberty and ISOP give their written

consent. *See id.* at 134. Notably, ISOP signed the Completion Contract, which

suggests ISOP's participation in this Completion Agreement was necessary. *See*

*id.* 150. The court finds that ISOP failed to sign any documents (much less

documents that actually show consent for E&C to assign its rights and

obligations to E&I) relevant to plaintiffs' written consent argument, and thus

E&I has failed to show that all required parties gave prior written consent to

such assignment.

E&I argues that even if there is no evidence of written consent, it could

not have known it needed to submit this evidence because Liberty allegedly

failed to provide notice to E&I about Liberty's defenses surrounding

assignment. *See* Docket 121 at 8. But Liberty was under no obligation to raise

this defense prior to trial, and even if it was, Liberty provided notice through its

answer to E&I's amended complaint. *See* Docket 118 at 15; Docket 44 at 13

(raising affirmative defenses that E&I had no standing to pursue breach of

contract claims and that E&C was barred from recovering due to admitting that

E&C suffered no damages). Thus, E&I had the burden to submit evidence that

E&C validly assigned E&C's rights and obligations to E&I, but failed to do so.

E&I next argues that Liberty waived this anti-assignment provision by

acquiescing to E&C's attempted assignment to E&I. *See* Docket 121 at 7-9.

According to E&I, Liberty cannot now argue that E&I is precluded from

recovering damages. *Id.* Under South Dakota law, a party can waive the benefit

of an anti-assignment provision if it clearly expresses a willingness, either

15

explicitly or through conduct, to accept an assignment. *See Grady*, 268 N.W.2d at 825; *Northland Capital Fin. Servs., LLC v. Robinson*, 976 N.W.2d 252, 258 (S.D. 2022). Specifically, the party arguing waiver must show "a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right." *Northland*, 976 N.W.2d at 258 (quoting *Norwest Bank S.D., N.A. v. Venners*, 440 N.W.2d 774, 775 (S.D. 1989)).

E&I cites a variety of documents in support of its argument that Liberty waived this anti-assignment provision. The first set of documents were not admitted into evidence, and the court declines to consider them. *See* Docket 121 at 8 (citing Docket 42, Docket 121-8; Docket 121-9); *Janssen Pharm., Inc., v. Teva Pharm. USA, Inc.*, 571 F.Supp.3d 281, 343-44 (D.N.J. 2021) (rejecting party's attempt to rely on materials outside of the trial record and collecting cases doing the same).

Second, E&I relies on two documents written by Banks in which Banks referenced E&I as the completion contractor rather than E&C. *See* Docket 121 at 8 (citing Docket 109-1 at 769, 775). While the court recognizes that Banks referred to E&I as the completion contractor in these documents, *see* Docket 109-1 at 769, 775, the court finds that these references are insufficient for E&I to meet its burden to show that Liberty waived the contractual provision prohibiting assignment absent written consent. E&C and E&I, although distinct legal entities, have nearly identical outward appearing features. *See* Docket 111 at 131-33; Docket 112 at 82-83; *compare* Docket 109-1 at 30-35, 38-40 (E&C's bids for the project), *with* Docket 109-1 at 53-54 (E&I's letter to

16

Banks requesting recovery). Both E&C and E&I have identical logos with identical fonts and color schemes, with the only difference being the "C" and "I." *Compare* Docket 109-1 at 30-35, 38-40 (E&C's bids for the project), *with* Docket 109-1 at 53-54 (letter from E&I). Both are owned by Bruce. *See* Docket 111 at 131-32. It is reasonable for someone to inadvertently reference E&I or E&C given their near-identical appearances and names. Thus, the court finds that these references are insufficient for E&I to prove that Liberty made a "clear, unequivocal and decisive act" to waive the contractual provision. *Northland*, 976 N.W.2d at 258. The court rejects E&I's argument to the contrary.

E&I also cites portions of the bench trial. *See* Docket 121 at 7-8 (citing Docket 110 at 84-85 and Docket 112 at 64). But this testimony is also insufficient. First, with respect to Banks' testimony, plaintiffs' counsel asked Banks, "And at the same time that Liberty Mutual was negotiating the Completion Agreement with E&I, it was also negotiating a Tender Agreement, right, with three points, with WAPA, E&I, and Liberty Mutual. Right?" Docket 110 at 84-85. Banks responded "Yes." *Id.* at 85. The court finds this simple "yes" is insufficient, particularly because the Tender Agreement that was admitted into evidence unequivocally shows E&C as the party that signed the agreement, not E&I. Docket 108 at 153-61. Furthermore, the court finds this Tender Agreement was prepared with much more attention to detail than an answer to a question at trial, and so is a better source of information to discern who entered into the Tender Agreement. With respect to Liberty's counsel's

17

statement during the bench trial, Liberty's counsel asked Bruce on cross-examination, "And as a completion contractor, E&I would have been the prime contractor on the job. Correct?" *See* Docket 112 at 64. Even assuming a lawyer's words can be imputed onto Liberty, this one-time question is also insufficient because, as discussed above, the two entities were consistently discussed and intermixed throughout trial and it would be easy to inadvertently say one rather than the other.

Plaintiffs' counsel apparently recognized the confusion when he stated during Bruce's direct examination, "And so let's bring some *clarity* to [E&C and E&I]. What's the distinction between E&I and E&C?" Docket 111 at 131 (emphasis added). Bruce testified that he intended to enter into the completion contract under E&C and that eventually "the completion contractor for this project sort of shifted over into the E&I lane[.]" *See id.* at 132-33. Bruce then testified, without providing any supporting evidence, that "everyone involved knew that that was the case[.]" *Id.* at 133. The court gives very little weight to Bruce's testimony here because it is speculative—there is no evidence of a written assignment or consent allowing such assignment—and the two entities are easy to confuse given their identical outward appearances.

E&I next argues that Liberty Mutual benefitted from E&C's alleged assignment and thus cannot argue that the assignment was unauthorized. Docket 121 at 8 (citing *Wandler v. Lewis*, 567 N.W.2d 377, 385 (S.D. 1997)). But the case E&I cites in support of this argument is distinguishable from this case. In *Wandler*, three individuals (collectively referred to as Lewis) sold real

18

property to an individual named McLeod in exchange for McLeod's agreement to pay Lewis $200,000 plus interest at ten-percent annum. *See* 567 N.W.2d at 378-79. The contract between Lewis and McLeod prohibited the buyer from assigning its interest without the express written consent of Lewis. *Id.* at 379. McLeod assigned his rights and interests in the contract to Dakota Placers, Inc., who then assigned its interest to Red Ex Associates. *Id.* at 380. Red Ex Associates was a joint venture between Blattner Placer, Inc. and Dakota Placers. *Id.* Lewis consented to McLeod's assignment to Red Ex Associates (and apparently also to the earlier assignment to Dakota Placers). *Id.* Later, the joint venture was terminated, and Blattner Placer assigned its interest to Dakota Placers. *Id.* There was no evidence of written consent to this assignment. *Id.*

Over the next few years, Lewis was aware of Dakota Placers and actively negotiated with Dakota Placers for payments pursuant to the contract. *See id.* Lewis accepted multiple payments from Dakota Placers. *Id.* Later, Dakota Placers assigned its interest to Donald Wandler, who was "able to pay the remaining amount [on the contract] due[.]" *Id.* at 385. Lewis also "was not harmed financially or legally by the assignment." *Id.*

Nevertheless, Lewis argued that Wandler, who initiated a declaratory judgment action seeking a court order that his interest in the property was superior to anyone else's, did not having standing to sue Lewis because Lewis did not consent to the assignment from Dakota Placers to Wandler and thus it violated the contract. *See id.* at 384. The South Dakota Supreme Court in *Wandler* rejected this argument, stating

19

> The previous acceptance of assignments without written consent, the lack of a provision for a forfeiture, the reason behind the provision being unaffected, the receipt of contract payments following the prior nonconsen[]ual assignments, and the fact that Wandler was able to pay the remaining due on the contract, cause us to agree with the trial court that a valid assignment existed.

*Id.* at 385.

The situation in E&I's case is much different than the one in *Wandler*. Unlike in *Wandler*, E&I submitted no evidence of any prior written consent by Liberty (or ISOP) for the assignment of E&C's interests to E&I. Additionally, Lewis's conduct of accepting multiple payments from Dakota Placers without objection unequivocally and clearly showed Lewis' acquiescence. *Id.* Here, E&I failed to submit any evidence that Liberty accepted any money from E&I. Furthermore, unlike in *Wandler*, where Lewis was "not harmed financially or legally by the assignment," E&I has failed to show that Liberty did not suffer any harm from this alleged assignment. To the contrary, the undisputed evidence at trial showed that WAPA terminated E&C and/or E&I for failing to complete the project according to schedule. *See* Docket 111 at 218, 231, 234; Docket 112 at 14.

Importantly, *Wandler* involved an assignment that simply concerned a buyer assigning its interest and obligations and the seller still collecting payments that were due. *See* 567 N.W.2d at 378-80. The assignment here is fundamentally different because Liberty, ISOP, E&C, and WAPA all contracted for E&C to serve as a Completion Contractor on

20

a significant, multi-million-dollar governmental project. *See* Docket 108 at 134-151. E&C agreed to complete the VT Hanlon project rather than simply agreeing to make payments to Liberty. This is a significant difference. In short, the court finds *Wandler* distinguishable and rejects E&I's argument that Liberty acquiesced to E&C's alleged assignment.

In a last-ditch effort, E&I ends by arguing that E&C is allowed to bring a claim on behalf of E&I, one of its subcontractors, and thus E&I can still recover. *See* Docket 132 at 6. In support, E&I cites a single out-of-state federal district court decision from 1948 applying Nebraska law. *See id.* at 6-7 (citing *J.W. Terteling & Sons v. Cent. Neb. Pub. Power & Irr. Dist.*, 8 F.R.D. 210 (D. Neb. 1948)). Even assuming South Dakota law follows the Nebraska law principles in *J.W.*,[5] the facts in *J.W.* are distinguishable from E&I's case. In *J.W.*, a general contractor sued a corporation for failure to pay the general contractor for work that the general contractor's subcontractors performed, with the corporation's knowledge and approval. *See* 8 F.R.D. at 211-12. The corporation argued that the subcontractors—not the general contractor—were the real

---

[5] The court declines to consider additional arguments or conduct extensive legal research on behalf of E&I on this argument, including whether South Dakota law follows the approach set forth in Nebraska in the 1940's. To do otherwise would be particularly inappropriate here given that E&I had a full opportunity to brief this issue in its post-trial briefs but failed to do so. Instead, E&I raised this argument after trial briefings and after its initial motion to reconsider. Indeed, E&I raised this specific argument for the first time in a reply brief to its reconsideration motion. *See* Docket 132 at 6-8. The time has long passed for E&I to make this argument. Further, in a footnote, E&I also provides a summary of "the undersigned's legal research" without citing a single case, much less one from the South Dakota Supreme Court. *See id.* at 7 n.1. Without more, this vague reference is insufficient for the court to meaningfully review and the court declines to dig further into the matter.

parties in interest, and thus the general contractor was not entitled to pursue the claim against the corporation on behalf of the subcontractor. *See id.* at 213. The *J.W.* court rejected this argument because, under Nebraska law, only the prime contractor could recover against the corporation, and thus the subcontractor would not be allowed to recover work the subcontractor performed. *See id.* The court observed the rationale behind the Nebraska rule, namely that generally, "a construction agreement between an owner and a prime contractor[] confers no rights against the former upon a subcontractor; and, in consequence, no right arises in favor of a subcontractor directly to sue the owner upon a subcontract, though it be approved by the owner." *Id.* (citation omitted). Because the subcontractor could only recover against the general contractor, the court found that the general contractor was the proper party to sue the corporation for the subcontractor's damages. *See id.* at 213-14.

The nature of the Completion Agreement in this instant case is different from a construction contract, because a construction contract such as the one in *J.W.* is between a general contractor and the building owner. Unlike a typical construction contract, the Completion Agreement here is a contract between the sureties (Liberty Mutual and ISOP), a completion contractor (E&C), and a subcontractor (E&I). Docket 108 at 134-35. The Completion Agreement here is not similar to the *J.W.* construction contract.

This difference matters. E&I's position is different from the subcontractor's position in *J.W.* because that case involved a subcontractor

who was contractually obligated to provide services to the general contractor, who in turn was contractually obligated to construct the overall project for the corporation. *See J.W.*, 8 F.R.D. at 212. After the corporation failed to pay the general contractor for such work that the subcontractor was contractually obligated to perform (and indeed did perform), the general contractor then appropriately sued the corporation to recover on behalf of the subcontractor's work. *See id.* at 213-14. Here, while E&I entered a subcontract with E&C, the subcontract between E&I and E&C does not automatically grant E&C the ability to recover on behalf of E&I.

Rather, to be factually analogous to *J.W.*, the damages sought by E&C (on behalf of E&I) against Liberty must have been for the work that E&I was contractually obligated to provide E&C. The specific damages E&C attempts to recover from Liberty are for certain payments allegedly due to Isolux's vendors or subcontractors for materials or services under the Completion Price's exclusions. *See* Docket 108 at 135-36; Docket 115 at 6-7. The Exclusions Clause exists as part of an agreement between E&C, E&I, and the sureties in which E&C—not E&I—agreed to complete the project in Isolux's shoes. *See* Docket 108 at 136 ("Completion Contractor agrees to prosecute the Work until Completion of the Project . . ."). Thus, E&I as a subcontractor cannot have been contractually entitled to receive any payments due under the Exclusions Clause to E&C (as the Completion Contractor), because E&I's original subcontracts with Isolux were limited to specific parts of the project rather than the entire project. *See id.* at 17, 20 (defining E&I's scope of work); *id.* at

23

68, 513 (same); *see also id.* at 152 (listing various other subcontractors). Put differently, unlike in *J.W.*, where the general contractor sought damages for specific work that the subcontractor was contractually obligated to perform for the general contractor, here E&C is attempting to seek damages on behalf of E&I that E&I is not contractually entitled to, either directly with the sureties or with E&C, because the Exclusions and Completion Price are terms that relate to the Completion Contractor's—E&C's—deal with respect to the entire project. This difference distinguishes *J.W.* from the present case.

To the extent that the South Dakota Supreme Court has extended the principles in *J.W.* to an analogous situation involving a Completion Agreement, E&I has failed to cite a case doing so. The court rejects E&I's final argument.

### C. Jury Trial

Finally, plaintiffs end by attempting to re-litigate—for a third time— whether plaintiffs were entitled to a jury trial. *See* Docket 121 at 10-17. The court evaluates this challenge under Civil Rule of Procedure 60, and finds that plaintiffs' reconsideration motion is untimely because plaintiffs failed to bring it within a "reasonable time." Fed. R. P. 60(c). Here, the court ordered the trial to be a bench trial and not a jury trial on December 12, 2022. Docket 70. The trial was scheduled to begin on February 14, 2023. *See* Docket 62. On January 30, 2023, two weeks before the trial, the court held a pretrial conference. Docket 92. Plaintiffs never filed a motion for reconsideration before the pretrial

24

conference,[6] nor did they orally request the court to reconsider its order during the pretrial conference. *See* Docket 95 at 41-42. During the pretrial conference, instead of moving for the court to reconsider its order directing the trial to be a court trial, plaintiffs appeared to blame the court for its failure to timely request a jury trial in the first place, stating, "And then I went back over the record and looked and saw that we had never had a single hearing in this courtroom. If we'd had a pretrial conference or a scheduling order conference, for example, I would have simply motioned on the record there." *Id.* at 42. Needless to say, the court is not at fault for plaintiffs' failure to timely request a jury. Plaintiffs are responsible for managing their litigation, not the court.

Even after the pretrial conference and before trial, plaintiffs failed to move for reconsideration on this issue. Rather, plaintiffs waited to raise the issue until the first day of trial. *See* Docket 110 at 8-9. And now, after a four-day long bench trial and after the court has issued its factual findings and legal conclusions, plaintiffs moved the court to reconsider its December 12, 2022 order. *See* Dockets 70, 110-113, 120. Plaintiffs had ample opportunity to ask the court to reconsider its decision denying a jury trial, but failed to do so. Plaintiffs again blame the court, arguing they did not file a reconsideration motion because it would have been futile due to the court's "stern response" denying plaintiffs a jury trial in its initial December 12, 2022 order. *See* Docket

---

[6] Notably, plaintiffs filed a reconsideration motion on December 23, 2022, raising various arguments, none of which included the jury trial issue. *See* Docket 74. The court subsequently denied plaintiffs' reconsideration motion in its entirety. Docket 88.

132 at 9-10. The court rejects this explanation because nothing about the court's order prevented plaintiffs from moving the court to reconsider its decision before it expended significant judicial resources on holding the trial and issuing factual findings and conclusions of law. The amount of prejudice Liberty faces here is significant due to the amount of resources Liberty has already expended in this litigation. Considering plaintiffs' inexplicable delay in filing a motion to reconsider and the prejudice to Liberty, the court finds plaintiffs failed to bring this Rule 60(b) motion within a reasonable time. *See* Fed. R. Civ. P. 60(c). The court thus denies plaintiffs' reconsideration motion on this issue on that basis alone.

Even considering the merits though, plaintiffs have failed to show why the court should change its decision. Under Federal Rule of Civil Procedure 38(d), "[a] party waives a jury trial unless its demand is properly served and filed." Fed. R. Civ. P. 38(d). Rule 38(b) provides that a jury trial demand must be served "no later than 14 days after the last pleading directed to the issue is served[.]" Fed. R. Civ. P. 38(b). If a party fails to timely demand a jury trial, a party may make a motion under Rule 39(b). *See* Fed. R. Civ. P. 39(b) ("[T]he court may, on motion, order a jury trial on any issue for which a jury might have been demanded."). By its express language of "may," Rule 39(b) affords the court discretion to determine whether a motion under Rule 39(b) should be granted. *See id.; Shelton v. Consumer Prods. Safety Com'n*, 277 F.3d 998, 1011 (8th Cir. 2002). The court does not abuse its discretion when it denies a jury trial if a party fails to provide an adequate justification for its failure to timely

26

demand a jury trial. *See Shelton*, 277 F.3d at 1011-12; *Littlefield v. Fort Dodge Messenger*, 614 F.2d 581, 585 (8th Cir. 1980).

Here, Liberty filed its answer to plaintiffs' original complaint on April 15, 2020. Docket 10. Thus, plaintiffs' deadline to file a jury demand on this first complaint was April 29, 2020. *See* Fed. R. Civ. P. 38(b). Plaintiffs failed to do so. Plaintiffs' counsel then realized in May 2020 that he had failed to timely make a jury demand. *See* Docket 121-5 at 3. At that time, counsel for plaintiffs stated that he intended to file an amended complaint to correctly identify Liberty and would request a jury trial in the amended complaint. *Id.* Apparently believing the amended complaint would only change the defendant's name, Liberty's counsel stated his belief that under Eighth Circuit caselaw, an amended complaint would not reset the clock for a timely jury demand. *See id.* Instead, Liberty's counsel suggested that the more appropriate approach would be for plaintiffs to file a motion to demand a jury trial, and that Liberty would not oppose the motion. *See id.*

Despite Liberty's suggestion, plaintiffs' amended complaint filed on November 19, 2021, reset the fourteen-day period for the plaintiffs to timely request a jury trial on at least some issues because the amended complaint added additional causes of action against the defendant rather than simply changing the defendant's name. *Compare* Docket 1 at 7-11, *with* Docket 43 at 9-12 (alleging for the first-time negligent misrepresentation and fraud and deceit); *see First Wis. Nat. Bank of Rice Lake v. Klapmeier*, 526 F.2d 77, 80 (8th Cir. 1975) (stating the jury trial demand clock resets "[w]henever new issues

27

are raised by amendment to either the complaint or answer as to those new issues"); *Shelton*, 277 F.3d at 1011 ("Because the second amended complaint contained no new triable issues that pertained to them, the right to a jury trial under Rule 38 was not revived."). But plaintiffs still did not request a jury trial in their amended complaint, nor did they request one within fourteen days of November 22, 2021, when Liberty filed its answer to the amended complaint.

Recognizing this failure, plaintiffs argue that they were justified in omitting this demand because their counsel relied on Liberty's counsel's representation that plaintiffs could not timely request a jury trial in an amended complaint. *See* Docket 121 at 11, 14. The court rejects any suggestion that the email exchange from Liberty's counsel justifies plaintiffs' untimely jury demand. First, Liberty's counsel simply stated his belief that the amended complaint would not reset the time, specifically in reference to his apparent (but mistaken) belief that the amended complaint would only change defendant's name. *See* Docket 121-5 at 3. If indeed the amended complaint only changed the defendant's name, this position was correct. *See Klapmeier*, 526 F.2d at 80. Thus, the court finds that this email was not intended to be malicious or deceptive. Second, even if this email incorrectly stated the law, that does not justify plaintiffs' reliance on such statement. Plaintiffs' counsel was free to disagree with Liberty's understanding of the issue and file a jury demand in the amended complaint. Plaintiffs' counsel is charged with independently and zealously advocating for his clients by conducting his own

28

legal research and he cannot justifiably rely on opposing counsel's assertions regarding opposing counsel's understanding of the law.

Furthermore, plaintiffs could have filed a motion requesting a jury trial under Federal Rule of Civil Procedure 39(b), as Liberty's counsel suggested. *See* Docket 121-5 at 3. But plaintiffs failed to file a motion[7] until December 8, 2022, which was over two-and-a-half years after the email exchange, over a year after Liberty filed its response to plaintiffs' amended complaint, and roughly two months before the scheduled trial date. *See* Dockets 62, 67. Plaintiffs blame COVID-19, but the court rejects this argument. *See* Docket 121 at 14-15; Docket 132 at 9. Although the court acknowledges the stress COVID-19 caused everyone, that alone is not enough to justify this significant delay in requesting a jury trial, particularly given that plaintiffs made numerous other filings throughout the height of the pandemic. *See, e.g.*, Dockets 14-15, 18, 20, 23, 26, 28, 33, 35, 38 (showing plaintiffs' filings in April 2020 through October 2021).

Plaintiffs next argue that Liberty consented to a jury trial and thus should be estopped from arguing that plaintiffs waived their right to one. *See* Docket 121 at 15-16. In support, plaintiffs argue that "[a] review of the emails [] show that there was no condition placed on the motion as to when it would be

---

[7] Plaintiffs' December 8, 2022 filing is arguably only a response to Liberty's motion to correct the court's trial scheduling order rather than a motion itself. But the court construes this filing as a motion under Rule 39(b). *See, e.g.*, *Sartin v. Cliff's Drilling Co.*, 2004 WL 551209, at *1 (E.D. L.A. Mar. 18, 2004) (construing response opposing defendant's motion to strike jury trial as a Rule 39(b) motion).

filed." *Id.* at 14. But Liberty's consent back in May 2020 for plaintiffs to file an unopposed motion under Rule 39(b) is not enough to show that Liberty consented to the motion in December 2022, just two months before the trial date. While there may not have been an explicit condition with regards to timing, the court declines to find that Liberty's consent to plaintiffs' motion at one point in time means that Liberty necessarily consents to a motion filed at any point in the future. To do otherwise would be unreasonable given the circumstances.

The court recognizes that Liberty's counsel referenced a jury in a few filings and some exchanges with plaintiffs' counsel. *See* Docket 56 at 11; Docket 57 at 14; Docket 58 at 5, 7-8; Docket 121-1. But most of these references are either discussing other cases that involved a jury or had legal standards that involved a hypothetical jury, *see* Docket 56 at 11; Docket 58 at 7-8, or quoting plaintiffs' brief, *see* Docket 58 at 5. These references do not indicate Liberty's affirmative consent to a jury. The closest filing is Liberty's reply in support of its motion to exclude plaintiff's second expert report, in which Liberty stated in a single paragraph that the jury could hear testimony regarding the expert's first report. *See* Docket 57 at 14. And the court acknowledges that Liberty's counsel referenced a jury in a settlement offer. *See* Docket 121-1 at 3. But the court finds these references are not enough to overcome plaintiffs' failure to timely submit a jury demand to the court or file a motion for a jury trial. If plaintiffs wanted a jury trial, they had ample opportunity to request one in a timely manner. It is not Liberty's (or the court's)

30

job to make-up for plaintiffs' failures on this front, and thus the court rejects plaintiffs' argument to the contrary. In short, the court declines to change its initial denial of a jury trial given plaintiffs' failure to provide a justifiable reason for requesting a jury trial so late in the game.

## III.   Conclusion

Plaintiffs failed to meet deadlines under the Federal Rules of Civil Procedure for requesting a jury trial and failed to meet their burden on their substantive claims. For the reasons stated above, the court denies plaintiffs' motion to reconsider in its entirety.

Thus, it is

ORDERED that plaintiffs' motion to reconsider (Docket 120) is DENIED.

Dated December 20, 2023.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

31